MICHAEL MIX (*pro hac vice*)
mmix@morrisoncohen.com
JASON P. GOTTLIEB (*pro hac vice*)
jgottlieb@morrisoncohen.com
WILLIAM ROTH (*pro hac vice*)
wroth@morrisoncohen.com
MORRISON COHEN LLP
909 Third Avenue, 27th Floor
New York, NY 10022
Telephone: (212) 735-8747

ELLEN LONDON (Cal. Bar No. 325580)
elondon@londonnaor.com
MICHAEL LUNDHOLM (Cal. Bar No. 336151)
elondon@londonnaor.com
LONDON & NAOR P.C.
1999 Harrison Street, Suite 2010
Oakland, CA 94612
Telephone: (415) 862-8485
Facsimile: (415) 862-8487

Attorneys for Plaintiff
VISHAL LALL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

VISHAL LALL, individually, and derivatively on behalf of Nominal Defendant PORTAL ORACLE CORP.

Plaintiff,

v.

AMIRHOSSEIN FOROUZANI, JASON ANDREW VRANEK, PUFFER LABS CORP., PUFFER FOUNDATION, PUFFER STAKING LIMITED

Defendants, and

PORTAL ORACLE CORP.

Nominal Defendant,

Case No. 25-cv-04948-EMC

**VERIFIED DIRECT AND DERIVATIVE ACTION AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Vishal Lall ("**Lall**"), directly on behalf of himself and derivatively on behalf of Portal Oracle Corp. ("**Portal Oracle**"), by and through his undersigned counsel, brings this amended complaint (the "**Amended Complaint**") against Defendants Amirhossein "Amir" Forouzani ("**Forouzani**") and Jason Andrew Vranek ("**Vranek**") (Forouzani and Vranek collectively, the "**Individual Defendants**"), and various corporate entities controlled and managed by the Individual Defendants, namely, Puffer Labs Corp. ("**Puffer Labs**"), Puffer Foundation, and Puffer Staking Limited ("**Puffer B.V.I.**") (Puffer Foundation and Puffer B.V.I. collectively, the "**Offshore Puffer Defendants**") (Puffer Labs and the Offshore Puffer Defendants collectively, the "**Puffer Entities**" or "**Puffer Defendants**") (the Individual Defendants and the Puffer Defendants collectively, "**Defendants**"). The allegations herein are based on Lall's personal knowledge with respect to himself, documents produced by Defendants in mediation and jurisdictional discovery, and upon information and belief.

## NATURE OF THE ACTION

1. This action presents an audacious scheme by Defendants to deny Lall his rights as a co-founder and equity holder in a digital assets project.

2. In 2022, Lall worked closely with the Individual Defendants to develop a blockchain-based decentralized finance (DeFi) protocol involving nodes running trusted execution environments (TEEs) that would make a service known as "liquid staking" more accessible, efficient, and in turn, more profitable. Collaborating as equal partners, Lall, Forouzani, and Vranek founded a trio of related corporate entities under the "Portal" brand in 2022 – Portal Oracle (a Delaware corporation), the Portal Oracle Foundation (an offshore Cayman foundation, the "**Portal Foundation**"), and Portal Oracle Limited (an offshore entity in the British Virgin Islands created for the specific purpose of issuing the team's eventual digital assets token, "**Portal B.V.I.**") (Portal Oracle, Portal Foundation, and Portal B.V.I. collectively, the "**Portal Entities**").

3. Lall, Forouzani, and Vranek (collectively, the "**Portal Founders**") also served as the only directors of Portal Oracle and Portal B.V.I. and enjoyed equal equity in the same. They were also the only directors of the Portal Foundation. At all relevant times, the Portal Founders ran the Portal Entities from California, where they resided.

4. The Portal Founders' vision, talent, and timing aligned, and in less than one year, they raised hundreds of thousands of dollars in investment from marquee venture funds in anticipation of launching their protocol on Ethereum's mainnet the following year.

5. Just as Lall, Forouzani, and Vranek stood to reap the benefits of their hard work, however, the Individual Defendants colluded in a brazen scheme to cut Lall out of the project, which would in turn enrich the Individual Defendants by increasing their relative equity stake.

6. The Individual Defendants commenced their scheme by terminating Lall's employment at the Portal Entities and removing him as a director of the same. Lall, however, still held an equal equity share of Portal Oracle and Portal B.V.I., and was still promised an equal share of the soon-to-be issued Portal protocol tokens (the "**Portal Tokens**").

7. The Individual Defendants thus had two choices: (1) they could continue running the Portal Entities, understanding that Lall, although terminated as an employee, director, and officer, would both remain a shareholder and receive his agreed-to share of Portal Tokens; or (2) negotiate a repurchase of Lall's shares and token rights.

8. Apparently unsatisfied with either of these legitimate options, and realizing that Lall could not be pressured into relinquishing his Portal Oracle and Portal B.V.I. equity or rights to their soon-to-be-issued Portal Tokens the Individual Defendants chose a third, flagrantly illegal option. The Individual Defendants conspired to misappropriate the Portal Entities' assets (including prior venture funding) and corporate opportunities to their "new" Puffer Entities, without paying any consideration or observing any of the necessary corporate processes.

9. The Individual Defendants then formally dissolved Portal B.V.I. and the Portal Foundation, and left Portal Oracle to flounder with nothing but outstanding debts. The Defendants' oppressive acts have enriched themselves at the expense of the Portal Entities, and Lall's now-worthless equity therein.

10. [redacted]

[redacted]

11. The limited discovery that Lall has obtained so far has illustrated the breathtaking previously-unknown lengths to which the Individual Defendant went to effectuate their scheme.[1] Below is a non-exhaustive list:

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[1] To date, Lall has taken limited jurisdictional and mediation discovery of Defendants, but has not taken full merits discovery. Full merits discovery will surely reveal the full extent of Defendants' scheme.

12. These facts are merely the tip of the iceberg. This Amended Complaint describes the scheme in detail, and discovery will reveal additional facts. But the facts set forth in the prior Paragraph are a representative sample illustrating Defendants' brazen breaches, [redacted]

13. This action, including a variety of direct and derivative claims, is about holding Forouzani, Vranek, and their Puffer Entities to account.

14. First, Lall brings direct claims seeking the project tokens that the Individual Defendants promised him (or the equivalent to the value thereof). Lall and the Individual Defendants had an agreement that they would each receive an equal portion of Portal's tokens. [redacted]

15. Second, Lall brings derivative claims on behalf of Portal Oracle, arising out of the Individual Defendants' looting and abandonment of Portal Oracle, which has left the company in hundreds of thousands of dollars in tax debt. More specifically, while the Individual Defendants were the sole directors of Portal Oracle, and had sole managerial control over its offshore affiliates, they orchestrated a scheme to misappropriate all aspects of Portal Oracle's business, from its biggest investors down to its monthly cloud subscriptions.

16. Third, Lall brings direct claims arising from Defendants' efforts to cut him – and him alone – out from the Portal Entities he worked so hard to help build. Because the Individual

Defendants have formally dissolved Portal B.V.I. and the Portal Foundation, Lall's direct personal claims are currently the only vehicle through which Lall can seek complete redress for Defendants' wrongdoing. Indeed, as authorized agents for the Offshore Puffer Defendants, the Individual Defendants have intentionally used their Cayman and B.V.I.-based entities to shut Lall out from his own companies, for their own benefit. They have done so all while managing the Portal and Puffer Entities from their corporate offices in California (Portal Oracle and Puffer Labs' principal place of business).

**JURISDICTION AND VENUE**

17. The United States District Court for the Northern District of California has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there exists complete diversity between Lall and Defendants, and the amount in controversy exclusive of fees and costs exceeds $75,000.

18. Lall's derivative claims are not collusive claims brought for the purpose of conferring jurisdiction on this Court.

19. This Court has general personal jurisdiction over the Individual Defendants because they have been domiciled in California at all relevant times. This Court also has general personal jurisdiction over Puffer Labs because its principal place of business is in this district. This Court also has specific personal jurisdiction over all Defendants because each Defendant directed their unlawful actions toward Lall, who resided in and was domiciled in this district, as well as Portal Oracle, the California-based corporation which the Individual Defendants managed and controlled from California. Moreover, the Individual Defendants committed their unlawful acts from California, where they have managed and controlled the Offshore Puffer Defendants. These same entities were and continue to be unjustly enriched by the Individual Defendants' conduct in California, where the Individual Defendants were the authorized agents, directors, and officers of the Offshore Puffer Defendants. In sum, The Individual Defendants' actions were specifically designed to cut Lall out of his own company and its offshore affiliates while maintaining their own control and ownership of the corporate assets they had built together with Lall throughout 2022.

20. Venue is proper in the United States District Court for the Northern District of California as this was the district where Lall resided during Defendants' misconduct, where Lall's injuries were incurred, and where at least one of the Individual Defendants continues to reside.

**PARTIES**

21. Plaintiff Vishal Lall is a citizen of the United States of America currently domiciled in Puerto Rico.

22. Defendant Amirhossein Forouzani is a citizen of Iran domiciled in California.

23. Defendant Jason Andrew Vranek is a citizen of the United States of America domiciled in California.

24. Defendant Puffer Labs is a Delaware corporation with a principal place of business in California. On information and belief, the Individual Defendants served as directors of Puffer Labs, were the primary shareholders in the same, and managed and controlled the company from California, where they resided, until Vranek's departure from the project in May 2025. On information and belief, Forouzani has solely controlled and owned Puffer Labs since that time.

25. Defendant Puffer B.V.I. is a British Virgin Islands corporation. On information and belief, the Individual Defendants served as the sole directors of until an unknown date in or around 2024, when they installed a new director. On information and belief, the Individual Defendants were the controlling shareholders of Puffer B.V.I. until Vranek's departure in May 2025. On information and belief, Forouzani has been the sole owner of Puffer B.V.I. since that time.

26. Defendant Puffer Foundation is a Cayman-incorporated foundation operating out of the Cayman Islands. The Individual Defendants served as the sole directors of the Puffer Foundation from California, where they reside, [redacted] The Puffer Foundation [redacted] works to cultivate activity on the Puffer blockchain protocol by executing token loan and market-making agreements with third parties.

27. Puffer Labs Corp., Puffer Staking Limited, and the Puffer Foundation were all founded by the Individual Defendants in California for the purpose of carrying on the activities of the Portal Entities and to deprive Lall of the benefits from his equity in the same.

28. Nominal Defendant Portal Oracle Corp. is a Delaware corporation with a principal place of business in California. The Portal Founders, including Lall, received and continue to hold equal equity in Portal Oracle. The Portal Founders also served as Portal Oracle's only three directors until the Individual Defendants unlawfully pushed Lall out as a director in November 2022, as outlined in greater detail below. At all relevant times, the Portal Founders have each held 6 million of the company's 20 million outstanding shares. Due to the Defendants' illegal acts, Portal Oracle has no assets, and overdue tax liabilities of more than $350,000.

## OTHER RELEVANT ENTITIES

29. The Portal Foundation was a non-profit foundation operating out of the Cayman Islands, incorporated for the purpose of promoting the development of the Portal protocol, which Defendants now operate as the Puffer Foundation. The Portal Founders served as the three directors of the Portal Oracle Foundation since its incorporation on August 12, 2022.

30. The Individual Defendants formally wound down the Portal Foundation in or around April 2023.

31. Portal B.V.I. was a British Virgin Islands corporation, incorporated for the purpose of issuing the Portal Tokens, which were never issued because Defendants diverted the Portal Entities' assets and business to the Puffer Entities. In October 2024, Puffer B.V.I. issued the Puffer token (the "**Puffer Tokens**"), and refused to grant Lall any of the tokens he was promised pursuant to the Portal Founders' agreements in 2022. The Portal Founders served as Portal B.V.I.'s three directors from its incorporation on July 8, 2022 until Lall's expulsion, when the Individual Directors remained Portal B.V.I.'s only owners and managers. At all relevant times, the Portal Founders each held an equal allotment of 16,666 ordinary shares in Portal B.V.I.

32. The Individual Defendants formally dissolved Portal B.V.I. in September 2023, after they had misappropriated all of its assets for their own and Puffer B.V.I.'s benefit. Lall did not receive any distribution, payment, or other consideration in connection with the disposition of any of Portal B.V.I.'s assets, including the SAFT investments Lall and the Individual Defendants had executed with multiple third-party venture funds.

## FACTUAL BACKGROUND

### A. Late 2020 – Early 2022: Lall Meets the Individual Defendants and The Three Founders Create the Portal Project

33. In late 2020, Lall and Forouzani worked together as data scientists at the NASA Jet Propulsion Laboratory, contributing to various projects related to science and engineering. Lall, an employee, mentored Forouzani, who worked as a contractor.

34. On February 24, 2021, Lall and Forouzani co-authored a proposal applying blockchain technology to space missions at NASA. The two would continue to discuss their mutual interest in blockchain technology, including decentralized finance.

35. By early 2022, Lall and Forouzani both worked remotely, and at the time they resided in Santa Cruz and San Diego, respectively. Vranek, who was already friends with Forouzani, was then a graduate student at the University of California, Santa Cruz.

36. On January 11, 2022, Forouzani sent a Slack message to Lall inviting him to a major blockchain industry event, the ETHDenver Hackathon, that Forouzani was planning to attend with Vranek from February 17 to February 21, 2022.

37. By February 3, 2022, Lall, Forouzani, and Vranek agreed they would attend ETHDenver together and submit a Hackathon entry as a team of three. In preparation, Lall invested significant time in late January and early February to collaborate with Forouzani and Vranek. Lall and the Individual Defendants ultimately submitted a decentralized search engine titled "Trust No1" to the Hackathon competition. The bedrock technology for Trust No1 was based on privacy-enhancing Trusted Execution Environments (TEEs), which can provide end-to-end security for certain data within a computational system. TEEs continued to provide the technological backbone to the Portal Founders' projects, including the Portal protocol itself.

38. The Portal Founders each contributed significant time to develop the code and intellectual property behind the Trust No1 software. For example, on February 18, 2022, the team created the first joint code repository in connection with Trust No1, titled "Gandao," with private access limited to the Portal Founders.

39. On February 20, 2022, the Portal Founders submitted the team's work to the Hackathon competition in the form of a YouTube video titled "EthDenver 2022 - TrustNo1." The slide deck for the presentation listed Lall as one of the submission's authors, alongside the Individual Defendants. The following day, on February 21, 2022, the Portal Founders presented Trust No1 on stage at ETHDenver in front of a large group of spectators and judges, including representatives from Jump Crypto, who would later become an early backer of the Portal project.

40. While the Portal Founders did not win the Hackathon, the team accomplished its main goal of gaining exposure to potential investors and the broader blockchain community. Indeed, Justin Brill and Rahul Maganti of Jump Crypto would later support the Portal project's legitimacy and standing amongst venture capitalists investing in the blockchain industry.

41. The last night the Portal Founders were in Denver for ETHDenver 2022, Forouzani met Christina Chen, a blockchain marketing and community management professional, at Temple Nightclub. On information and belief, Forouzani began a physically intimate – and later romantic – relationship with Chen at that time. Forouzani and Chen withheld the fact of their relationship from investors and advisors the team solicited through Chen's network of contacts.

42. Following their presentation at ETHDenver, the Portal Founders decided to continue working together and to formally establish a company. They created a Discord server to discuss their new venture, and within a few days, decided to name their project "Portal."

43. Lall immediately contributed to the development of the Portal project in various significant ways. In addition to continued engineering support reflected on the Portal project's GitHub repositories, Lall provided the Portal Founders with market research and product design, pitched to potential investors, attended networking events, set up the Portal Founders' email accounts, and designed the first iterations of the project's websites (formerly available at https://www.portal3.ai/ and https://www.portalcompute.com). Lall even spent personal savings to retain third-party contractors, via freelance marketplace Fiverr.

44. Within a couple of weeks, the Portal Founders had drafted the first iteration of the Portal project pitch deck, highlighting a diagram that reflected how TEEs could be leveraged as

blockchain oracles for machine learning. As with the team's ETHDenver presentation and all Portal project pitch decks that would follow, Lall was a member of the founding team.

**Portal Project Pitch Deck Team Slide**




45. While Lall and Vranek spent much of March 2022 continuing to build the Portal project's first products, Forouzani spent an increasing portion of his time traveling to raise capital. In addition to tapping the Portal Founders' own professional networks to solicit investment, Forouzani also relied on Christina Chen's personal network within the blockchain industry. More generally, Chen began playing a significant but unofficial role in the Portal project's future. For example, Chen introduced the Portal Founders to James McDowell at Arcanum Capital; Allan Zhang, who upon information and belief was Chen's former boss; and her colleague David Ri Sun, who the Portal Founders retained as an accountant and who incorporated Portal Oracle.

46. In late March 2022, Forouzani flew to Dubai and upon information and belief shared a hotel room with Chen. She introduced Forouzani in person to her own investor, McDowell, while Lall and Vranek remained in the United States to continue working on the Portal project's products. Lall continued developing the Portal project's website and completed a range of projects on the Portal project's GitHub.

47. On March 23, 2022, Vranek publicly posted the Portal project's first official whitepaper, listing Lall as a co-author (the "**Portal Whitepaper**"). The Portal Whitepaper was hosted on one of the sites Lall created, https://whitepaper.portal3.ai/.

48. Lall also took the initiative to conduct business to the Portal project's benefit while in California. On March 25, 2022, for example, Lall emailed the CEO of Cardano (one of the largest blockchain platforms) to ask to pitch the Portal project. Two days later, Lall and Vranek met with potential investors at Catalise.

49. By early April 2022, the Portal project had begun soliciting investment from funds including Arcanum Capital, IoTeX, LBank Labs, Sequoia Capital, DoraHacks, and Lightspeed Ventures.

50. On April 6, 2022, Forouzani traveled to Miami on behalf of the Portal Founders to attend the Bitcoin Miami conference. On information and belief, while in Miami, Forouzani discussed the Portal project's decentralized search engine concept with a group convened at a house belonging to a former Google CEO. The same day, Forouzani reported to Lall and Vranek that he had met the Head of Listings at Binance.US.

51. Approximately one week later, the Portal Founders met with Arcanum Capital. Lall, Forouzani, and Vranek each participated in pitching to Arcanum Capital, who subsequently became the Portal project's first investor.

52. Inspired by their traction with potential investors, the Portal Founders realized they needed to formalize the Portal project's corporate structure. A heated debate ensued regarding which Portal Founder would be granted which titles, and when the team could not decide, Forouzani sent Lall a text message asking Lall if he would be willing to be CEO. However, the Portal Founders ultimately determined that Forouzani would serve as CEO because he had spent more time in an external-facing role. Vranek was named Chief Technology Officer, and Lall was named Chief Product Officer.

53. In May 2022, Arcanum Capital invested $250,000 in the Portal project. As is common in the digital assets industry, Arcanum Capital did not take equity in any of the Portal Entities, but instead entered a SAFT (Simple Agreement for Future Tokens), based on a $30 million valuation of the future Portal Tokens (i.e., Arcanum Capital's consideration was in the Portal project's yet-to-be launched digital asset token, not equity in any of the Portal Entities themselves). In contemporaneous

communications, Arcanum Capital acknowledged that this valuation represented a 40% discount from a prospective $50M token valuation.

54. The Portal Founders also began to retain a more comprehensive set of third-party contractors for graphic design, accounting, and outside counsel services. As noted above, many of these contractors were colleagues or acquaintances of Chen, to whom, on information and belief, Chen did not disclose her developing romantic relationship with Forouzani.

55. Arcanum Capital's $250,000 token purchase price was delivered to a digital assets wallet in the form of dollar-denominated stablecoins. Each of the Portal Founders – and only the Portal Founders – held the private keys to this wallet. Shortly after finalizing its purchase, Arcanum Capital publicly referenced its contribution to the Portal project on its website.

56. Meanwhile, Lall continued to build out the Portal project's codebase and design additional use cases. These additions are reflected in contemporaneous corporate records, including, but not limited to, the Portal Founders' team Discord chat.

57. In late June 2022, Forouzani convinced Lall and Vranek that Chen should be retained as an Advisor to the Portal project and compensated by a 0.6% share of future Portal Tokens, to vest on a 2-year schedule. The Portal Founders further agreed to retain Chen's former boss Allan Zhang, as another Advisor with the same terms of compensation (0.6% of future Portal tokens, to vest on a 2-year schedule).

**B. Late 2022: The Portal Founders Incorporate Their Business <u>and Begin Pivot to Anti-Slashing Staking Protocol</u>**

58. Following Arcanum's token purchase, the Portal Founders met with multiple prospective investors throughout the summer, including Charles Hoskinson (the founder of the Cardano ecosystem), Binance Labs, BlueRun Ventures, Fenbushi Capital, Pillar VC, and Sequoia Capital. The Portal Founders also continued to attend industry events, including the flagship Consensus event in Austin, Texas, that same summer.

59. In early July 2022, the Portal Founders also took the critical step of legally incorporating three related Portal Entities. First, the Portal Founders incorporated Portal Oracle, a

Delaware Corporation governed by Delaware law, as their domestic operating business. The Portal Founders received an equal portion of Portal Oracle's equity (6 million shares each).

60. In addition to Portal Oracle, the Portal Founders also incorporated two offshore entities: (1) Portal B.V.I., for purposes of eventually issuing the Portal Token; and (2) the Portal Foundation, a Cayman Islands entity that the Portal Founders structured to function as a treasury for the trio of Portal Entities. The Portal Founders had exclusive signing authority for the Portal Entities' bank accounts and power to approve transfer of assets from any of the Portal Entities.

61. This tripartite structure – one U.S.-based operating company and two (or sometimes one) offshore entities – is extremely common in the digital assets industry.

62. As is also extremely common in the digital assets industry, the Portal Founders frequently took steps on behalf of "Portal" as a brand or a project as a whole, without strictly delineating between the three Portal Entities.

63. Likewise, when investors executed SAFTs with Portal B.V.I., they understood that Lall and the Individual Defendants would build the Portal project's products as agents of all the Portal Entities and as regular employees of Portal Oracle, working on the project in California. Outside investment in digital assets projects is nearly always effectuated via agreements with offshore entities, for various legal and tax reasons.

64. Demonstrating how interdependent Portal Oracle and its affiliates were, Forouzani purported to execute a services agreement between Portal Oracle and the Portal Foundation, setting out how the entities related to each other. According to this agreement, Portal Oracle (the domestic operating company) played the following essential functions: developing the Portal project's code base; research and development; testing services and deployment of the Portal project's smart contracts on various blockchains; human resource operations (i.e. paying Lall and the Individual Defendants a regular salary as employees); retaining and compensating the Portal project's partners and third-party contractors; business development and planning; and investor relations consulting. In other words, Portal Oracle was the lifeblood of the Portal project ecosystem, responsible for the entire day-to-day operation that built, maintained, and managed the Portal project's products and services.

65. To fulfill its obligations, Portal Oracle's own bank accounts tended to hold hundreds of thousands of dollars to sustain the company's operations.

66. The Portal Founders also came to an agreement with respect to allocating their (not yet issues) Portal Token. They set aside 30% for outside investors, and agreed to reserve and allocate 20% of the Portal Token supply for the Portal project team, including subsequent hires. The Portal Founders memorialized these allocations in the Portal Entities' materials, including, but not limited to, presentations distributed to investors. The Portal Founders further agreed that of the 20% of Portal Tokens reserved for the Portal project team, a minimum of 10% of the total Portal Token supply would be split equally amongst themselves (i.e., each of them would receive at least 3.33% of the total Portal Token supply (the "**Founders' Token Agreement**"). This agreement among founders that they each would receive a certain percentage of the ultimate token issued by a particular digital assets project – in return for co-founding such project – is extremely common in the digital assets industry.

67. Also in July 2022, Forouzani proposed elevating Chen to Chief Marketing Officer of the Portal project. Lall and Vranek, who by this point understood that Forouzani was in a romantic relationship with Chen, were uncomfortable with the idea and voiced concern over the proposal, upsetting Forouzani and setting the stage for future internal clashes regarding Chen's role.

68. On July 29, 2022, the Portal Founders achieved another milestone when Jump Crypto invested $300,000 in exchange for 0.6% of the forthcoming Portal Token. Jump Crypto executed a SAFT with Portal B.V.I., on the understanding that those same funds would be used by the Portal Entities (i.e. the Portal Founders) to build the Portal project's products in the United States. [redacted]

69. On or around the same date, the Portal Founders negotiated a market-making agreement with Jump Crypto, whereby Jump would provide various services to ensure liquidity for the forthcoming Portal Token.

70. On August 9, 2022, IoTeX executed a SAFT to invest $100,000 USDT, and transferred the funds to the digital asset wallet used by the Portal Founders to fund the Portal Entities the following day, bringing the total amount of outside investment to date up to $650,000. That same

day, Forouzani met with Justin Drake, Director of Research at the Ethereum Foundation, about how the Portal project might be able to partner with the Ethereum Foundation.

71. On September 28, 2022, in order to convert a portion of the Portal Entities' digital assets into U.S. dollars, public blockchain activity shows that the Individual Defendants transferred $220,000 USDT to a private merchant, with the proceeds directed to Portal Oracle's financial accounts. These funds were used to support Portal Oracle's business operations, and later misappropriated by the Individual Defendants on behalf of the Puffer Entities.

72. In early October 2022, based in part on Forouzani's meeting with Drake and the Ethereum Foundation, the Portal Founders decided to pivot their company to build a non-custodial and slash-resistant liquid staking protocol built on Ethereum. The Portal Founders quickly began coding this new protocol and contemporaneous documentation reflected that the Portal Founders envisioned launching the protocol as the Portal project's product. Nonetheless, the Individual Defendants subsequently misappropriated this protocol under the banner of their "new" company, "Puffer."

73. On October 3, 2022, the Portal Founders met with the Ethereum Foundation to discuss anti-slashing software the Ethereum Foundation wanted the Portal project to build in exchange for an Ethereum Foundation grant. Meeting notes from that day lists the attendees as "Portal: Amir Forouzani, Jason Vranek, Vishal Lall" with a link to the Portal project website, as well as attendees from the Ethereum Foundation, including Justin Drake, James Smith, and Josh Rudolf.

74. On October 11, 2022, Lall traveled to Bogota, Colombia for Ethereum DevCon to secure the Ethereum Foundation grant and obtain feedback on the Portal project's new direction from investors. Two days later, on October 13, 2022, Lall again met with members of the Ethereum Foundation in person, including Josh Rudolf, with Forouzani and Vranek attending the meeting remotely. Following that meeting, Rudolf messaged Lall that the Ethereum Foundation was interested in providing a grant to the Portal project, but that it could take "2-3 months." That same day, Lall met with more than ten investors and reported back to Forouzani and Vranek about plausible leads for the Portal Entities.

75. On October 13, 2022, Forouzani again proposed giving Chen a formal title such as Chief Marketing Officer and an allocation of future tokens, in addition to her Advisor role which already came with a token allocation. Again, Forouzani stood down once Lall protested.

76. Making the Portal project's pivot official, Vranek posted to Discord on October 16, 2022, "Portal is a non-custodial and slash-resistant staking protocol built on Ethereum 2.0 that allows stakers to earn more." The Portal Founders felt confident that their pivot to this slash-resistant protocol featuring permissionless validator nodes and lower staking requirements than competitors would be both easier to launch and more profitable than the initial compute oracle concept. A few days later, Vranek published new code to Portal's GitHub for what would later be misrepresented as the Puffer project's "Secure-Signer" repository. This code included the Portal Founders' TEE research funded by the Ethereum Foundation grant, and would become a key component that distinguished the Portal project's platform.

77. The Portal Founders reworked their pitch deck to reflect their pivot to the slash-resistant staking protocol concept and presented the new version to third parties, including during in-person meetings with Jump Crypto at their Chicago office. As with the earlier iterations of the Portal project pitch decks, the new version of the pitch deck named Lall as a co-founder, on equal footing with the Individual Defendants.

78. Lall's substantive contributions to the Portal Entities continued apace following the Portal project's pivot. For example, in late October 2022, Lall drafted a proposal for the Portal project's token economics, revised the new pitch deck, met with graphic designers, and tested the new codebase. Lall also conducted critical market research, communicating about the same in Discord chats with the Portal Founders. Lall then secured testnet tokens from the Ethereum Foundation for the purpose of testing the Portal project's staking nodes and to conduct anti-slashing research. These testnet tokens and nodes were a key component of the Portal protocol that the Individual Defendants would later incorporate into the Puffer protocol. Blockchain activity on an Ethereum testnet presents public evidence that at least some staking infrastructure setup by the Portal project was later used by the Puffer Entities, suggesting further comingling of technical resources.

79. In total, Lall contributed over 1,000 hours of his time to develop the Portal project's products and public-facing explainers for the same. Lall was the second listed author of the Portal Whitepaper, and designed Portal project's tokenomics – including the very founders' token shares the Individual Defendants would soon withhold from Lall.

80. On October 25, 2022, the Ethereum Foundation's partnership with the Portal project further crystallized. According to meeting notes taken by Vranek, Justin Drake indicated "he's happy to consider a concrete offer" to be an advisor for the Portal project. Drake would go on to be the advisor for the Puffer project shortly thereafter.

81. Days later, Forouzani started to discuss changing the company's name to an animal. Specifically, on October 28, 2022, Forouzani floated the idea of changing the Portal project's brand name to "something correlated with water," and suggested "our brand animal should be water animal." Forouzani relayed that Chen thought an animal would make a good new logo, and that he agreed, leading Vranek to text Lall that he was frustrated that Forouzani always seemed to agree with Chen regarding the Portal project's business decisions. Soon thereafter, Vranek would post a puffer fish logo in the Portal team's Discord as a potential rebrand idea, without any indication that the Portal Founders were contemplating launching a separate business.

82. On October 31, 2022, in a Trello Board containing Lall, Vranek, Forouzani, and Chen referencing the pivot titled "Portal 2.0", Chen wrote, "Strongly suggest to remain Portal brand name." Consistent with the Individual Defendants' intention for Portal Oracle to otherwise remain the same company after the product pivot, Chen further stated, "We have used that brand to talk to hundreds of investors for the past 8 months, as well as numerous partners. We also signed contracts with investors too. We have grown to love Portal. People all know Portal, that the brand awareness takes time to build. We only consider to change some designs in logo and the whole marketing theme."

83. Related internal team activity on the Trello Board spanned from October 2022 until January 2023, overlapping with the inception of the Puffer project. Tasks that were marked as clearly having begun at the Portal project were later updated, completed, or commented on as work product under the "Puffer" name. These tasks on the "Portal 2.0" board include programming the Puffer project's future Secure-Signer codebase, finalizing the Ethereum Foundation Grant, securing Justin

Drake as an advisor, communicating with lawyers, rewriting the team's research paper, and conducting slash-resistant research for Ethereum staking nodes. Timestamped evidence demonstrates that these tasks continued during the period the Individual Defendants claimed to have established the Puffer project, highlighting operational continuity between the Portal project and the Puffer project.

### C. November 2022: The Individual Defendants Remove Lall as a Director and Officer of the Portal Entities

84. On the morning of November 2, 2022, Forouzani scheduled a one-on-one meeting with Lall. Lall had no reason to suspect anything out of the ordinary was about to take place – no prior notice, no prior complaints, no concerns raised – but once the meeting began, Forouzani immediately blindsided Lall and requested that he step down from the Portal Entities. Less than five minutes into the discussion, Forouzani added two more participants to the call – individuals who, unbeknownst to Lall, had been waiting in the virtual lobby. These two members were Vranek and the Portal Founders' CPA, David Ri Sun of APO Bridge, who was Chen's colleague and had fulfilled various ministerial corporate functions for the Portal Entities throughout 2022. Forouzani then declared an impromptu board meeting, where Forouzani read from a prepared statement, and pressured Lall to sign exit documents within twenty-four hours. Notably, the Individual Defendants expressly stated their intention to buy back the shares owned by Lall as part of his separation, and presented Lall with exit documents that likewise acknowledged that Lall had (and continues to have) 6,000,000 shares in Portal Oracle (the Delaware corporation) and 16,666 shares in Portal Oracle Limited (the B.V.I. corporation) – the same number of shares that each of the Individual Defendants held.

85. Lall, realizing that he was being coerced out of his rightful ownership in Portal Oracle and its offshore affiliates, refused to agree to or sign any of the exit documents.

86. Lall's refusal to indulge the Individual Defendants' ultimatum put the Individual Defendants in a bind of their own creation – the Individual Defendants could not legally force Lall to forfeit his equity, but they had failed to prepare any orderly process to reasonably negotiate Lall's departure from their startup. Accordingly, the Individual Defendants continued to negotiate terms,

including by offering Lall a token allocation in exchange for his complete separation and relinquishment of all Portal Entity shares. None of these offers came close to accurately reflecting the value of Lall's contributions to the Portal Entities or fairly valued his shares in them.

87. On November 5, 2022, even though Lall remained a director and officer of all the Portal Entities and with the parties at a stalemate, the Individual Defendants locked Lall out from accessing Portal Entity corporate files and systems.

88. Five days later, on November 10, 2022 – again, while Lall was still a director and officer of the Portal Entities – someone purchased the current Puffer project domain name puffer.fi. On information and belief, one of the Individual Defendants purchased the domain or caused it to be purchased. On information and belief, the Individual Defendants purchased or caused to be purchased another domain, pufferfinance.com, one week later.

89. The Individual Defendants then purported to remove Lall from all of his Board and employment roles at the Portal Entities. On November 11, 2022, the Individual Defendants terminated Lall's Portal employment, and executed a written resolution removing Lall as a director, officer, and Chief Procurement Officer from the Portal Foundation. Three days later, on November 14, 2022, the Individual Defendants executed a Written Consent of Stockholders in Lieu of Special Meeting, removing Lall as a Portal Oracle director.

90. Lall reiterated his position that nothing the Individual Defendants were doing plausibly affected Lall's Portal Oracle equity, which is reflected in Portal Oracle's Board minutes. Lall further expressed his dismay that the Individual Defendants appeared to be cutting him out of his own company due to his discomfort with Chen's increasing influence, and that Forouzani, by failing to disclose his romantic relationship with Chen while the Portal project was soliciting investment, had acted unethically with respect to his Board position and duties to the Portal project and Portal Oracle's shareholders. In subsequent email messages, Forouzani conceded that none of the Individual Defendants' actions above caused Lall to relinquish his equity in Portal Oracle, which he continues to possess. The Individual Defendants took all (or substantially all) of the above actions while in California.

### D. Late 2022 – Summer 2023: The Individual Defendants Misappropriate Portal Project Business the Puffer Defendants' Benefit

91. Once the Individual Defendants had removed Lall as a director and officer from the Portal Entities, they could have simply continued their business operations, understanding that Lall would continue be a minority shareholder (with no day-to-day power) and would receive the soon-to-be-issued Portal Tokens. [redacted]

92. Accordingly, the Individual Defendants conspired to duplicate Portal Oracle, Portal B.V.I., and the Portal Foundation in a new trio of companies – Puffer Labs, Puffer B.V.I., and the Puffer Foundation.

93. From California, and as the sole authorized agents and representatives of the Puffer Defendants, the Individual Defendants undertook a series of interrelated actions that not only illegally injured Lall and the Portal Entities, [redacted]

94. Thus, in all respects, the Individual Defendants' scheme treated the Puffer Defendants as successors to the Portal Entities.

95. To start, shortly after ousting Lall from his operational roles at the Portal Entities, and notwithstanding that the Individual Defendants had taken no measures to wind-up the Portal Entities or sell its assets, the Individual Defendants started stripping references to the Portal Entities from the Internet. They began by removing all "Portal" branding from the Portal project's GitHub repository, changing the name from "PortalCompute" to "PufferFinance." [redacted] To this day, the Puffer project protocol is hosted on the public account founded by Lall and the Individual Defendants for the Portal Entities' benefit.

96. [redacted]

97. [redacted] Having submitted a presentation under the "Portal" company name, Vranek began his talk by noting: "We are no longer Portal, we are Puffer." *See* Columbia Engineering, SESSION 5: Lightning Talks - Columbia CryptoEconomics Workshop, 12.01.2022, YOUTUBE, https://www.youtube.com/watch?v=itgfYrsZWtE.

98. [redacted]

99. Just a few days later, the Individual Defendants created a Twitter handle for "Puffer Finance," @puffer_finance, which remains the Puffer project handle to this day. The Individual Defendants featured information from the Portal project's pitch decks on their "new" website, https://www.puffer.fi, including the exact same investor list – Jump Crypto, Arcanum Capital, IoTex – and highlighting the Ethereum Foundation grant. Of course, despite the claims on the Puffer project's new website, investments from Jump Crypto, Arcanum Capital, and IoTeX remained in the Portal project's cryptocurrency wallet until late February 2023, all while being attributed to the Puffer project since December 2022.

100. [redacted] On this same day, Justin Drake published a post on the Ethereum Research website, thanking the Puffer project for its contributions and directly mentioning that the Puffer project was awarded an Ethereum Foundation grant. Puffer's official website continued to reference this same post until 2024.

101. [redacted]

102. [redacted]

103. [redacted]

104. Upon information and belief, and based on the discovery provided by Defendants so far, it appears that – similar to the Portal Entities and as is also extremely common in the digital assets industry – [redacted]

105. On February 24, 2023, immediately after Puffer Labs obtained its certificate to operate in California, the Individual Defendants, while in California and acting as the sole authorized agents of Puffer Labs and the Offshore Puffer Defendants, fraudulently transferred the equivalent of more than $400,000 in digital assets out of a multi-signature wallet (0x0Fa096a8EFf91AAafC8Cc49f2BDfE1fF56f1B8E4) used by the Portal Founders to receive outside investment into Portal B.V.I. and to finance the Portal Entities' operations (i.e., grants to the Portal Foundation and regular disbursements to Portal Oracle in support of the Portal project's critical day-to-day business operations).

**<u>February 2023 Misappropriation of Portal Entity Funds</u>**

FEB 23, 2023

| | | | | | |
|---|---|---|---|---|---|
| 31 | ↗ Sent | -4.53488 ETH | 10:58 PM | Success | ⌄ |
| 30 | ↗ Sent | -989.21825 USDT | 10:50 PM | Success | ⌄ |
| 29 | ↗ Sent | -7.03K USDC | 10:48 PM | Success | ⌄ |
| 28 | ↗ Sent | -100,000 USDC | 10:34 PM | Success | ⌄ |
| 27 | ↗ Sent | -100,000 USDC | 10:17 PM | Success | ⌄ |
| 26 | ↗ Sent | -100,000 USDC | 10:07 PM | Success | ⌄ |
| 25 | ↗ Sent | -100,000 USDC | 9:36 PM | Success | ⌄ |
| 24 | ↗ Sent | -90 USDC | 8:47 PM | Success | ⌄ |
| 23 | ⊗ On-chain rejection | | 8:39 PM | Success | ⌄ |
| 22 | ↗ Sent | -10 USDC | 8:10 PM | Success | ⌄ |

106. Thus, over the course of approximately 10 transactions. In just three hours, the Individual Defendants emptied the primary source of funding for Portal Oracle's business in the United States, leaving Portal Oracle (and its offshore affiliates) unable to meet its obligations and without performing any formal corporate governance measures on behalf of any Portal Entity to allow such transactions to occur. [redacted]

107. For the avoidance of doubt, Portal received no consideration in exchange for these withdrawals, which looted Portal's corporate treasury to the Defendants' benefit and at Lall's sole expense.[2]

---

[2] *See* https://app.safe.global/transactions/history?safe=eth:0x0Fa096a8EFf91AAafC8Cc49f2BDfE1fF56f1B8E4 (last accessed April 3, 2026)

108. [redacted]

109. [redacted]

110. [redacted]

111. Again, the Individual Defendants executed these transfers while working as full-time employees on Portal Oracle's payroll in California.

112. Thus, from a corporate and administrative standpoint, the Individual Defendants managed and controlled the Puffer Entities as successors to the Portal Entities (i.e., they were controlled by Individual Defendants to conduct the same activities with the same funds as the Portal Entities), and the Individual Defendants have done so from their homes and offices in California.

113. Even after the Individual Defendants terminated Lall's employment from Portal Oracle, "Puffer Labs" inadvertently continued to pay Lall for two pay periods. Both payments registered in Lall's bank accounts exactly as past payments from Portal Oracle had, with the same 10-digit identifier assigned to the transaction suggesting the same underlying account. It was not until May 2023 that the Defendants' CPA realized the payments had gone out and insisted Lall repay them.

114. On April 23, 2023, the Individual Defendants posted rebranded user documentation for the Secure-Signer code, developed by Portal Oracle, including instructions for how users could send tokens to the Portal project's Ethereum testnet address. Shortly thereafter, the Individual Defendants wrote new copy for the Puffer project's website, stating, "Puffer is a slash-free and

permissionless liquid staking protocol that facilitates at-home staking via a low bond requirement of 2 ETH. The Puffer team presents Secure-Signer, a remote-signing tool compatible with all consensus clients that prevents slashable offenses through trusted hardware." This description is practically identical to how the Portal Founders described the Portal project as of the company's latest pitch deck.

**E. The Individual Defendants Characterize the Change from <u>"Portal" to "Puffer" as a Mere "Rebrand"</u>**

115. The Individual Defendants' decision to misappropriate all of the Portal Entities' business and assets for the benefit of the Puffer Defendants created another problem of their own making, namely, that as far as IoTex, Arcanum, Jump Crypto, and the Ethereum Foundation were concerned, they had invested in and provided a grant to the Portal project, not the Puffer project.

116. [redacted]

117. [redacted]

118. On information and belief, the Individual Defendants have never truthfully explained the true story to these counterparties.

119. In all material respects, the Individual Defendants have always held out the Puffer Entities to be mere continuations of the Portal Entities in every material respect, concealing their misappropriation of Portal's business and assets from the third parties they dealt with. [redacted]

[redacted]

120. [redacted]

121. [redacted]

[redacted]

[redacted]

122. [redacted]

[redacted]

[redacted]

[redacted]

123. [redacted]

[redacted]

124. [redacted]

[redacted]

125. [redacted]

126. [redacted]

127. [redacted]

128. Defendants' own descriptions of the Puffer project failed to even distinguish what the Puffer project did from what Portal project did, as displayed in a side-by-side comparison of Portal's October 2022 materials (left) with Puffer Finance's December 2022 materials (right) (red boxes added to annotate similarities):

**<u>Portal's Public Marketing v. Puffer's Public Marketing Two Months Apart</u>**




129. [redacted]

130. [redacted]

[redacted]

131. Understandably, then, including at least one Portal investor, expressly drew an equivalence between the Portal Entities and Puffer Defendants on its own materials. From January 2023 until at least February 2024, Arcanum Capital listed its investment as being in "Puffer FKA Portal." To this day, Arcanum Capital's homepage shows an investment in "Puffer" dating back to May 2022, when the firm invested in the Portal project.

132. Even in more public contexts, the Individual Defendants have held Puffer out to be a successor of Portal.

133. Vranek's LinkedIn profile, for example, listed his role as CTO (now listed as Contributor) of "Puffer Finance" beginning on February 2022, when all Portal Founders had attended the Hackathon:[3]




[3] *See* https://www.linkedin.com/in/jason-vranek/ (last accessed June 7, 2025)

134. Meanwhile, Christina Chen's public profile states that she has been a "Contributor" at "Puffer Finance" from May 2022 through the present, highlighting that Chen, like the Defendants, have always considered Portal and Puffer to be one and the same. On information and belief, Chen formally became Chief Marketing Officer of Puffer Labs by July 2023.[4]

**F. <u>August 2023 – the Present: Defendants Raise Millions of Dollars and Launch the Portal Platform Under the "Puffer" Name</u>**

135. By Summer 2023, the Individual Defendants were ready to implement the next phase of their scheme: raising fresh capital from investors based on the Portal project's anti-slashing staking




protocol.

136. [redacted]

137. The investors who initially invested in the Portal project and still boast about their investments in the Puffer project have acknowledged that the Puffer Entities are in fact successor entities to the Portal Entities. In an article highlighting the success of Arcanum Capital in the digital assets space, Forbes reporter Christos Makridis commented, "in March 2022 *when Puffer was called Portal*, and before it had raised any capital at all, James [McDowell] and Rahul [Maganti] met Founder Amir for the first time at a private investor lunch in Dubai organized by Luchang [Zheng], and knew almost immediately that Arcanum needed to back him and the team he wanted to build. In May, Arcanum became their first investors by providing pre-seed capital." Christos Makridis, FORBES, "Arcanum Capital Disrupts Web3 Venture Capital With 'Circular Economy'," Feb. 7,

[4] *See* https://www.linkedin.com/in/christinaxyz/ (last accessed June 7, 2025).

2024, *available at* https://www.forbes.com/sites/zengernews/2024/02/07/arcanum-capital-disrupts-web3-venture-capital-with-circular-economy/ (emphasis added). Zheng confirmed the same in a video interview, stating that the firm invested in the Puffer project in 2022 as its first investor, stating, "we wrote a check back in 2022. When nobody knew what they were doing, when they were not doing exactly what they are doing right now." In the same interview, Zheng stated, "they didn't start the product in the beginning, they pivoted," confirming knowledge of the product pivot. *See* Bridging the Gap, *Women pioneering in VC - Luchang Zheng in conversation with Subah Zaeem*, YouTube (Oct. 3, 2023) https://www.youtube.com/watch?v=S3oFIi7pP2o. Likewise, Jing Sun, the Head of Investment and Ecosystem at IoTeX, publicly represents that she has been an angel investor in Puffer Labs since 2022, despite the fact that blockchain activity shows IoTeX invested in Portal, not Puffer, in 2022.[5]

138. Even when the Individual Defendants have more recently described what Puffer does, their comments have shown how Defendants are merely carrying the Portal Founders' work from 2022 forward. For example, in an interview on February 22, 2024, Forouzani discussed the substance of the Portal project's engineering, conversations that occurred in the Portal project's Discord server, and how the Ethereum Foundation's grant was made to benefit Portal's anti-slashing technology that the Defendants have misappropriated under the Puffer name.

139. [redacted]

140. Defendants have been earning fees at least since the Puffer protocol's launch on Ethereum mainnet in 2024. Significant portions of these earned fees are in the possession, custody, and control of the Offshore Puffer Defendants' bank accounts and treasury wallets.

141. Furthermore, on or around October 14, 2024, Defendants conducted a token generation event to issue the Puffer Tokens.

---

[5] *See* https://www.linkedin.com/in/cbetasun/ (last accessed June 7, 2025)

142. Consistent with the Founders' Token Agreement, the Individual Defendants allocated no less than 10% of Puffer Tokens to themselves, just as the Portal Founders had planned on for the Portal Token.

143. [redacted]

G. **The Individual Defendants Have Dissolved the Offshore Portal Entities and Abandoned Portal Oracle with Nothing but Debt**

144. On information and belief, the Individual Defendants have effectively abandoned the Portal Entities since November 2022.

145. Since siphoning all of the Portal Entities' assets into the Puffer Defendants, the Individual Defendants have destroyed the entire value of Portal Oracle and left it with nothing but unpaid debts. In gross violation of their fiduciary duties, the Individual Defendants have left Portal Oracle delinquent with approximately $350,000 in taxes due as of March 2026.

146. [redacted]

147. [redacted]

148. [redacted]

[redacted]

149. [redacted]

**Demand is Excused as to the Portal Oracle Board for Lall's Derivative Claims**

150. Portal Oracle's Board is comprised of the Individual Defendants. Lall has not made a demand of the Portal Oracle Board to investigate or pursue the derivative claims herein because demand is excused as futile.

151. Since the Individual Defendants removed Lall as a Portal Oracle director in November 2022, the Portal Oracle Board has been comprised entirely of conflicted insiders who cannot reasonably be expected to respond to a demand in good faith. By virtue of their acts outlined above, the Individual Defendants who comprise the Portal Oracle Board stood to benefit by diverting Portal's assets and business to the Puffer Defendants, which the Individual Defendants own, manage, and

control as a continuation of the Portal Entities. The Individual Defendants jointly decided to remove Lall as a Portal Oracle director, divert Portal's assets, and thereby oppress Lall as a minority shareholder in Portal Oracle. As a result, at least half the Portal Oracle directors received a material personal benefit from the alleged misconduct, and face a substantial likelihood of liability on the claims that would be the subject of a demand.

152. Based on the foregoing, the Portal Oracle Board could not properly exercise their business judgment in acting on any demand. Demand is therefore excused.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Direct Claim Against Individual Defendants)**

153. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

154. Lall and the Individual Defendants are parties to the Founders' Token Agreement, an enforceable oral agreement to allocate to each of themselves an equal portion of Portal Tokens, which were to be issued by Portal B.V.I. as consideration for co-founding the Portal Entities. This agreement was separate and apart from other related agreements for Lall's individual compensation and equity in the Portal Entities.

155. Lall complied with all of his contractual obligations under the Founders' Token Agreement. Namely, Lall acted as an equal co-founder of the Portal Entities throughout 2022, in advance of their planned token issuance and sale.

156. Having founded the Portal Entities with the Individual Defendants, there were no conditions precedent to Lall receiving his share of Portal Tokens under the Founders' Token Agreement.

157. To unlawfully avoid performance of the Founders' Token Agreement, the Individual Defendants formally dissolved Portal B.V.I. and the Portal Foundation, and effectively abandoned Portal Oracle itself.

158. The Individual Defendants then incorporated duplicate successor entities, namely, the Puffer Defendants.

159. The Individual Defendants then breached the Founders' Token Agreement by causing Puffer B.V.I. to issue the Puffer Token in October 2024 on materially identical terms to how they had planned to issue the Portal Token through Portal B.V.I., and refusing to provide any Puffer Tokens to Lall. In sum and substance, the Puffer token differs from the never-issued Portal Token in name only. The Individual Defendants' treatment of Puffer B.V.I. as a successor to Portal B.V.I. is evidenced by, among other facts, that they have caused Puffer B.V.I. to execute agreements purporting to "amend" agreements initially executed by Portal B.V.I.

160. Whereas the Lall and the Individual Defendants agreed to split at least 10% of the total Portal Token supply three ways, the Individual Defendants ultimately split at least 10% of the total Puffer token supply two ways. In other words, the Individual Defendants have completely performed the material terms of their initial plan, except that they unlawfully cut Lall out.

161. On information and belief, the Individual Defendants have not withheld any tokens from any individual or entity who stood to receive Portal Tokens, aside from Lall. Instead, the Individual Defendants have caused all such individual and entities to receive Puffer Tokens of equivalent value.

162. As a direct result of the Individual Defendants' breaching their agreement to provide Lall with tokens, Lall has been unlawfully deprived of the benefit of his bargain with the Individual Defendants.

163. Accordingly, Lall is owed damages in an amount to be determined at trial.

## <u>SECOND CAUSE OF ACTION</u>
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Direct Claim Against Individual Defendants)
### (In the alternative to the First Cause of Action)

164. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

165. Lall and the Individual Defendants are parties to the Founders' Token Agreement, an enforceable oral agreement to allocate to each of themselves an equal portion of Portal Tokens, which were to be issued by Portal B.V.I., as consideration for co-founding the Portal Entities. This

agreement was separate and apart from other related agreements for Lall's individual compensation and equity in the Portal Entities.

166. The Founders' Token Agreement included an implied covenant of good faith and fair dealing.

167. Lall complied with all of his contractual obligations under the Founders' Token Agreement. Namely, Lall acted as an equal co-founder of the Portal Entities throughout 2022, in advance of their planned token issuance and sale.

168. Having founded the Portal Entities with the Individual Defendants, there were no conditions precedent to Lall receiving his share of Portal Tokens under the Founders' Token Agreement.

169. In violation of their covenant of good faith and fair dealing, the Individual Defendants formally dissolved Portal B.V.I. and the Portal Foundation, and effectively abandoned Portal Oracle itself.

170. The Individual Defendants then incorporated duplicate successor entities, namely, the Puffer Defendants.

171. The Individual Defendants then caused Puffer B.V.I. to issue the Puffer Token in October 2024 on materially identical terms to how they had planned to issue the Portal Token through Portal B.V.I., but refused to provide any tokens to Lall. In sum and substance, the Puffer Token differs from the now-defunct Portal Token in name only. The Individual Defendants' treatment of Puffer B.V.I. as a successor to Portal B.V.I. is evidence by, among other facts, that they have caused Puffer B.V.I. to execute agreements purporting to "amend" agreements initially executed by Portal B.V.I.

172. Whereas the Lall and the Individual Defendants agreed to split at least 10% of the total Portal Token supply three ways, the Individual Defendants ultimately split at least 10% of the total Puffer Token supply two ways. In other words, the Individual Defendants have completely performed the material terms of their initial plan, except that they unlawfully cut Lall out.

173. On information and belief, the Individual Defendants have not withheld any tokens from any individual or entity who stood to receive Portal Tokens, except for Lall. Instead, the

Individual Defendants have caused all such individual and entities to receive Puffer Tokens of equivalent value.

174. As a direct result of the Individual Defendants' breaching their agreement to provide Lall with tokens, Lall has been unlawfully deprived of the benefit of his bargain with the Individual Defendants.

175. The Individual Defendants' scheme to substitute the Puffer Defendants for the Portal Entities, in circumvention of their obligations to Lall individually, constitutes a clear violation of their covenant of good faith and fair dealing under the Founders' Token Agreement.

176. Accordingly, Lall is owed damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## QUANTUM MERUIT
## (Direct Claim Against Individual Defendants)
## (In the alternative to the First and Second Causes of Action)

177. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

178. To the extent the Court find that Lall has not sufficiently alleged an enforceable agreement with the Individual Defendants, Lall has sufficiently alleged that in exchange for his extensive services as a co-founder, director, and officer in the Portal Entities, he reasonably expected to receive an equal allocation of Portal Tokens to be issued by Portal B.V.I.

179. The Individual Defendants accepted the services provided by Lall and obtained a valuable benefit from them.

180. Lall reasonably expected to be compensated for the services he rendered, separate and apart from his ordinary salary income.

181. Lall should be compensated for the services he rendered, separate and apart from his ordinary salary income.

182. In particular, as is common in the digital assets industry, as a co-founder, Lall reasonably expected to be compensated, and should be compensated, by receiving a reasonable share of digital asset tokens issued by the project.

183. To unlawfully avoid satisfying this reasonable expectation, to provide Lall his rightful share of tokens, the Individual Defendants formally dissolved Portal B.V.I. and the Portal Foundation, and effectively abandoned Portal Oracle itself.

184. The Individual Defendants then incorporated duplicate successor entities, namely, the Puffer Defendants.

185. The Individual Defendants then caused Puffer B.V.I. to issue the Puffer Token in October 2024 on materially identical terms to how they had planned to issue the Portal Token through Portal B.V.I., but refused to provide any Puffer Tokens to Lall. In sum and substance, the Puffer Token differs from the now-defunct Portal Token in name only. The Individual Defendants' treatment of Puffer B.V.I. as a successor to Portal B.V.I. is evidence by, among other facts, that they have caused Puffer B.V.I. to execute agreements purporting to "amend" agreements initially executed by Portal B.V.I.

186. Whereas the Lall and the Individual Defendants agreed to split at least 10% of the total Portal Token supply three ways, the Individual Defendants ultimately split at least 10% of the total Puffer Token supply two ways. In other words, the Individual Defendants have completely performed the material terms of their initial plan, except that they unlawfully cut Lall out.

187. On information and belief, the Individual Defendants have not withheld any tokens from any individual or entity who stood to receive Portal tokens, aside from Lall. Instead, the Individual Defendants have caused all such individual and entities to receive Puffer Tokens of equivalent value.

188. Accordingly, Lall is owed damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Direct Claim Against Individual Defendants)**
**(In the alternative to the First through Third Causes of Action)**

189. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

190. Through their wrongful course of conduct and actions, the Individual Defendants and Puffer B.V.I. were and continue to be unjustly enriched at the expense of, and to the detriment of Lall.

191. Namely, in their individual capacities and as directors and officers of Puffer B.V.I., which the Individual Defendants have at all relevant times treated as a successor to Portal B.V.I., the Individual Defendants and Puffer B.V.I. issued the Puffer Token in October 2024, and have withheld tokens owed to Lall.

192. By withholding tokens lawfully owed to Lall, the Individual Defendants and Puffer B.V.I. have enriched themselves. It is against equity and good conscience to permit the Individual Defendants to enrich themselves by splitting at least 10% of the total Puffer Token supply two ways, rather than three ways.

193. The Individual Defendants have taken such actions on behalf of Puffer B.V.I. while located in California and while acting as authorized agents of Puffer B.V.I.

194. A constructive trust or restitutionary damages are appropriate remedies for unjust enrichment. Accordingly, the Court should impose a constructive trust comprised of at least the equivalent of 3.33% of the total supply of Puffer Tokens, or alternatively, restitutionary damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
## (Derivative Claim Against Individual Defendants On Behalf of Portal Oracle)

195. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

196. The Individual Defendants Forouzani and Vranek, as directors of Portal Oracle, owe fiduciary duties of care and loyalty to Portal Oracle and its shareholders. The Individual Defendants are further obligated to act in Portal Oracle's best interests, including, but not limited to, by not usurping the company's corporate opportunities.

197. The Individual Defendants breached their fiduciary duties to Portal Oracle by, among other things: (1) diverting all of Portal Oracle's assets as well as Portal Oracle's business, including its prospective investor leads, intellectual property, and software code to the Puffer Defendants without any consideration; (2) usurping Portal Oracle's opportunities to obtain investments and grants from, among many other third parties, Binance Labs and the Ethereum Foundation; (3) usurping Portal Oracle's opportunities by launching the Puffer project on Ethereum mainnet in early 2024

based on Portal Oracle's proprietary software, intellectual property, trade secrets, and corporate work product; and (4) abruptly transferring and assigning all of Portal Oracle's remaining assets, accounts, and third-party agreements without any notice, consideration, or approval by the company's shareholders or board of directors.

198. The Individual Defendants breached their fiduciary duties in the abovementioned ways without even attempting to negotiate in the best interests of Portal Oracle. Indeed, the Individual Defendants committed such acts to benefit the Puffer Defendants' shareholders at the direct expense of Portal Oracle's own shareholders.

199. As a direct result of the Individual Defendants breaching their fiduciary duties, Portal's shareholders have been damaged and will continue to suffer damages in an amount to be determined at trial but believed to be in excess of ten million dollars. Furthermore, Lall is entitled to attorneys' fees and costs in the event Lall prevails in this action.

**<u>SIXTH CAUSE OF ACTION</u>**
**BREACH OF FIDUCIARY DUTY**
**(Directly Against Individual Defendants)**

200. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

201. At all relevant times, the Individual Defendants and Lall each held an equal amount of equity in Portal Oracle.

202. The Individual Defendants Forouzani and Vranek, as directors of Portal Oracle, owe fiduciary duties to Lall as a minority shareholder in Portal Oracle. The Individual Defendants are further obligated to not use their power as directors and (together) majority shareholders in Portal Oracle to oppress Lall or otherwise destroy the value of Lall's Portal Oracle shares.

203. Under Delaware law, courts have routinely upheld direct claims for *pro rata* recovery in certain extraordinary circumstances: (1) "Cases where the defendants are insiders who misappropriated corporate property such that an entity-level recovery would return the property to the wrongdoers' control;" (2) "Cases where an entity-level recovery would benefit 'guilty' stockholders, but an investor-level recovery could be more narrowly tailored to benefit only 'innocent' stockholders; and (3) "Cases where the entity is no longer an independent going concern,

such that channeling the recovery through the corporation is no longer feasible or a *pro rata* recovery is more efficient." *Goldstein v. Denner*, No. CV 2020-1061-JTL, 2022 WL 1797224, at *17 (Del. Ch. June 2, 2022) (collecting cases).

204. All three extraordinary circumstances are present in this case. The Individual Defendants breached their fiduciary duties specifically as to Lall as a minority investor, by: (1) conspiring to single Lall out among shareholders and expropriate the value of his shares for their own benefit; (2) omitting their true intentions to misappropriate Portal Oracle's the Portal Entities' assets without paying any consideration to Lall, for their own benefit; and (3) abandoning Portal Oracle to hinder Lall's ability to seek redress on behalf of the company.

205. As a result of the Individual Defendants' breaching their fiduciary duties, Lall has been singularly damaged and will continue to suffer damages in an amount to be determined at trial, but believed to be in excess of ten million dollars.

**<u>SEVENTH CAUSE OF ACTION</u>**
**UNJUST ENRICHMENT**
**(Direct Claim Against All Defendants)**

206. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

207. Through their wrongful course of conduct and actions, the Individual Defendants and Puffer Defendants were and continue to be unjustly enriched at the expense of, and to the detriment of Lall personally.

208. Defendants have been unjustly enriched by coordinating the misappropriation of the Portal Entities' assets and opportunities for the express purpose of depriving Lall of any of his lawful equity in Portal Oracle and Portal B.V.I. which have been abandoned and formally dissolved, respectively, as well as Lall's personal rights as a director of the Portal Foundation.

209. Defendants have enriched themselves without paying Lall any consideration whatsoever.

210. [redacted]

[redacted] This investment is routinely disbursed by Puffer B.V.I. to Puffer Labs and the Puffer Foundation for their exclusive benefit.

211. Defendants have also been unjustly enriched by earned fees and other income from their use of Portal Oracle's proprietary products and intellectual property, all of which should have enriched Lall as a minority shareholder in Portal Oracle and Portal B.V.I.

212. Defendants have also been unjustly enriched by the value of their allocated Puffer Tokens, which they issued or otherwise distributed in lieu of a Portal token.

213. Defendants have also frustrated Lall's ability to seek redress on behalf of Portal B.V.I. and Portal Foundation by formally dissolving those entities in their respective jurisdictions. All of the Defendants were aware of the abovementioned benefits being conferred upon them and have and continue to accept and retain such benefits.

214. While Lall reserves the right to commence proceedings in the British Virgin Islands and the Cayman Islands on behalf of Portal B.V.I. and the Portal Foundation, derivative claims on behalf of those entities are not presently available under applicable law. Therefore, Lall's individual, direct claims are the only viable path for his redress as an oppressed minority shareholder. Moreover, Defendants' scheme was specifically designed to harm Lall individually, without harming any of the other shareholders or stakeholders in Portal Oracle or Portal B.V.I. Indeed, these other parties have all been the beneficiaries of Defendants' misconduct.

215. It is against equity and good conscience to permit the Defendants to enrich themselves at Lall's sole expense.

216. As a result of Defendants' unjust enrichment, Lall is entitled to a constructive trust, or restitutionary damages in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**FRAUD**
**(Direct Claim Against Individual Defendants)**

217. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

218. The Individual Defendants, while acting as the authorized agents for the Puffer Defendants in California, defrauded Lall personally by knowingly misrepresenting and omitting their

intentions to continue managing the Portal Entities while he remained a shareholder in Portal Oracle and Portal B.V.I.

219. The Individual Defendants' knowing misrepresentations and omissions were intended to prevent Lall from exercising his rights as a minority shareholder of Portal Oracle and Portal B.V.I., and as a director of the Portal Foundation.

220. Lall justifiably relied on the Individual Defendants' representations that they would continue managing the Portal Entities even after his removal as an employee, director, and officer of the same.

221. Indeed, the Individual Defendants purposefully kept their plan a secret from Lall as well as additional innocent third parties, to avoid any scrutiny that would have foiled their unlawful scheme.

222. The Individual Defendants' fraudulent conduct has harmed Lall individually by eliminating his right and ability to participate in the Portal Entities.

223. As a result of the Individual Defendants' fraudulent conduct, Lall has been singularly damaged and will continue to suffer damages in an amount to be determined at trial, but believed to be in excess of ten million dollars. Furthermore, Lall is entitled to the costs he may incur in connection with reviving Portal B.V.I. and the Portal Foundation.

**NINTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT DECLARING THE PUFFER ENTITIES TO BE SUCCESSORS OF THE PORTAL ENTITIES AND IMPOSING A CONSTRUCTIVE TRUST**
**(Direct Claim Against the Puffer Defendants)**

224. Lall hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

225. Under Delaware law, a constructive trust is an appropriate remedy for the recovery of money where defendants breached a fiduciary duty or have been unjustly enriched. *In re Green Field Energy Servs., Inc.*, 610 B.R. 760, 775 (D. Del. 2019). Similarly, under English law, a constructive trust is available where: (1) defendants dispose of assets in breach of a fiduciary duty; (2) the beneficial receipt by the defendants of assets which are traceable as representing the assets of the plaintiff; and (3) knowledge on the part of the defendants that the assets they received are traceable

to a breach of fiduciary duty. *In re Fairfield Sentry Ltd.*, 666 B.R. 230, 240–41 (Bankr. S.D.N.Y. 2024).

226. The Individual Defendants have owned, operated, and managed the Puffer Entities as successor entities to the Portal Entities. Further, at all times, the Puffer Entities have held themselves out as successor entities of the Portal Entities. Furthermore, as alleged above, all Defendants have been knowingly unjustly enriched by the Individual Defendants' misconduct, including, but not limited to, their breach of their fiduciary duties to the Portal Entities.

227. Therefore, consistent with Delaware law and English law and in the event that this Court deems it not feasible to award Lall monetary damages, the Court should impose a constructive trust comprised of one-third of the Puffer Entities' assets, including any Puffer Tokens currently allocated for the Individual Defendants, so that Lall may recoup the value of his Portal Oracle shares, equity, or tokens which Defendants have unlawfully diverted to the Puffer Entities.

## RELIEF REQUESTED

**WHEREFORE**, For the foregoing reasons, Lall respectfully requests that the Court issue judgment against Defendants as follows:

(a) On the First Cause of Action, damages of at least the equivalent of 3.33% of the total supply of Puffer's tokens.

(b) On the Second Cause of Action, damages of at least the equivalent of 3.33% of the total supply of Puffer's tokens.

(c) On the Third Cause of Action, the value of the services rendered, at least the equivalent of 3.33% of the total supply of Puffer's tokens.

(d) On the Fourth Cause of Action, a constructive trust comprised of the equivalent of at least 3.33% of the total supply of Puffer's tokens, or alternatively restitutionary damages of at least the equivalent of 3.33% of the total supply of Puffer's tokens.

(e) On the Fifth Cause of Action, damages in an amount to be determined at trial but believed to be in excess of ten million dollars, as well as attorneys' fees and costs.

(f) On the Sixth Cause of Action, damages in an amount to be determined at trial, but believed to be in excess of ten million dollars.

(g) On the Seventh Cause of Action, a constructive trust, or restitutionary damages in an amount to be determined at trial.

(h) On the Eighth Cause of Action, damages in an amount to be determined at trial, but believed to be in excess of ten million dollars.

(i) On the Ninth Cause of Action, a constructive trust comprised of one-third of the Puffer Entities' assets, including any Puffer Tokens currently allocated for the Individual Defendants, so that Lall may recoup the value of his Portal Oracle shares, equity, or tokens which Defendants have unlawfully diverted to the Puffer Entities.

(j) Such other and further relief the Court deems just and proper.

Dated: April 3, 2026

**MORRISON COHEN LLP**

*/s/ Michael Mix*
Michael Mix (*pro hac vice*)
Jason Gottlieb (*pro hac vice*)
William Roth (*pro hac vice*)
909 Third Avenue
New York, New York10022
jgottlieb@morrisoncohen.com
mmix@morrisoncohen.com
wroth@morrisoncohen.com
(212) 735-8600

**LONDON & NAOR P.C.**
ELLEN LONDON (Cal. Bar No. 325580)
elondon@londonnaor.com
MICHAEL LUNDHOLM (Cal. Bar No. 336151)
elondon@londonnaor.com
1999 Harrison Street, Suite 2010
Oakland, CA 94612
Telephone: (415) 862-8485
Facsimile: (415) 862-8487

*Attorneys for Plaintiff Vishal Lall*

## VERIFICATION

I, VISHAL LALL, declare:

I am the Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof. The same is true of my own knowledge, except as to the matters which are therein stated to be alleged on information and belief, and that as to those matters, I believe them to be true.

Executed on April 3, 2026.

I declare under penalty of perjury that the foregoing is true and correct.

Vishal Lall